## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LORI OSTENFELD, DEBORAH GESCHWIND, MARGARET MURPHY and JUDY STILWILL, individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> THE LAUNDRESS, LLC, <br><br> Defendant. | Case No.: 1:22-cv-10667-JMF <br><br><br> **CONSOLIDATED CLASS ACTION COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

Plaintiffs Lori Ostenfeld, Deborah Geschwind, Margaret Murphy, and Judy Stilwill ("Plaintiffs"), on behalf of themselves and all others similarly situated, by their attorneys, allege the following upon information and belief, except for those allegations pertaining to Plaintiffs, which are based on their personal knowledge:

## NATURE OF THE ACTION

1.    This action seeks to remedy injuries caused by contaminated cleaning Products[1] manufactured, marketed, distributed, and sold by Defendant The Laundress, LLC ("Laundress" or "Defendant").

---

[1] "Product(s)" include, but are not limited to, All Purpose Bleach Alternative & Cleaning, All Purpose Cleaning Concentrate, Aromatherapy Associates Support Breathe Dish Detergent, Aromatherapy Associates Support Breathe Surface Cleaner, Baby Detergent, Delicate Lady Wash, Dish Detergent, Fabric Conditioner Baby, Fresh Wash Signature Detergent, Glass & Mirror Cleaner, Home Cleaning Starter Kit, Kitchen Clean Duo, Pet Mess Kit, Signature Detergent & Fabric Conditioner, Stain Removal Essentials, Surface Cleaner, Whites Detergent, Wool & Cashmere Shampoo & Wool & Cashmere Spray. According to Defendant, over 250 Laundress Products can be contaminated with bacteria. A full list of the products included in this definition is available at

2.      Since at least January 2021, the Products contained various bacteria that can cause serious and life-threatening adverse health issues, including *Burkholderia cepacia* complex, *Klebsiella aerogenes* and multiple different species of *Pseudomonas*. The risk of serious infection and even death is particularly concerning for immunocompromised individuals who are highly susceptible to bacterial infections.

3.      From at least January 2021 until November 2022, Defendant failed to disclose that the Products contained dangerous bacteria or were at unreasonable risk of containing dangerous bacteria even though Defendant knew of those risks long before November 2022 based on consumer reports of *Pseudomonas* infections; Defendant's sophistication and internal controls; the substantial length of the contamination (at least from January 2021 until September 2022); and the enormous number of Products impacted (8 million units). On December 1, 2022, Defendant ultimately recalled all existing Products even though Defendant suggested that the contamination only impacts Products produced between January 2021 and September 2022.

4.      Defendant failed to disclose and actively concealed the risk of bacterial contamination to prevent a nosedive in sales and protect Laundress's business. Defendant understood that a systemic design and/or manufacturing defect in the Products rendered the Products nonmerchantable and that disclosing the risk of bacterial contamination would jeopardize Laundress's existence. Five months after Defendant revealed the truth, Defendant has still not resumed production of the Products and has given no definitive timeline for restarting sales. Defendant had exclusive knowledge of the contamination risk (including from consumer reports of injury) and understood that consumers, including Plaintiffs, depended on truthful

---

https://www.thelaundressrecall.com/_files/ugd/b51df1_730f72b3535e49cdad3ac8f4c2d895c7.pdf.

disclosures to make their purchasing decisions and would not purchase or use products contaminated with bacteria or at unreasonable risk of bacterial contamination.

*5.*     From at least January 2021 until November 2022, Defendant misleadingly represented on Product labels that the Products were "Nontoxic, biodegradable, and allergen-free" when the Products were contaminated with, or were at unreasonable risk of being contaminated with, a highly toxic cocktail of bacteria. During that same time, Defendant universally presented Laundress as a manufacturer, distributer, and/or seller of premium cleaning Products that were natural, non-toxic, and better for the environment when Defendant understood that the Products were contaminated with toxic bacteria and/or at an unreasonable risk of toxic bacterial contamination due to systemic and readily apparent Product design and manufacturing defects.

6.     From at least January 2021 until November 2022, Defendant placed at least eight (8) million potentially contaminated products into the stream of commerce, placing millions of individuals including Plaintiffs at substantial risk of bacterial infection and even death. Defendant's misconduct presented a substantial and unjustifiable risk of injury to consumers and provided no countervailing benefit to consumers considering the severe risk of injury and death.

7.     In November and December 2022, Defendant finally admitted the risk of bacterial contamination and that eleven (11) consumers had reported *Pseudomonas* infections potentially connected to the Products. Upon information and belief, Defendant made those admissions due to accumulating consumer injury reports; intervention by the Consumer Product Safety Commission ("CPSC") or other regulatory entities; and/or because Defendant knew that its competitors had already disclosed or were soon going to disclose and recall cleaning and laundry products based on the risk of bacterial contamination. The timing of these recalls along with the involvement of the CPSC cannot be a coincidence. Instead, in November and December 2022, Defendant decided to disclose the risk of bacterial contamination to avoid the severe

consequences stemming from consciously disregarding that risk and continuing to sell adulterated and unreasonably dangerous Products.

8.      During the Class Period, Plaintiffs purchased Products that Defendant later and untimely identified as being at risk of bacterial contamination.[2]

9.      Plaintiffs purchased the Products based on Defendant's false and misleading representations that it sold natural, non-toxic, and environmentally friendly and cruelty-free premium Products, misrepresentations or misleading partial truths given that the Products contained, or were at unreasonable risk of containing, toxic bacteria. Moreover, the Products did not disclose that the Products contained bacteria (in the ingredient section or otherwise); did not disclose the risk of bacterial contamination due to systemic Product design and/or manufacturing defects; and provided no warnings or instructions regarding the risk of bacterial contamination, the presence of bacteria, or the signs of, and what to do if a user suspected, an infection.

10.     When Plaintiffs and the Class Members purchased and used the Products, they reviewed the inadequate Product labeling and instructions and relied on Defendant's misrepresentations and omissions about the Products, including misleading and incomplete representations that the Products were "non-toxic" and omissions regarding the presence of, or unreasonable risk of, bacterial contamination.

11.     Plaintiffs suffered damages and injuries after purchasing and using contaminated and worthless Products. Plaintiff Ostenfeld suffered respiratory and skin injuries after purchasing and using the Products. Plaintiff Murphy and her family suffered respiratory infections, skin infections, rashes, and hives. Plaintiff Stilwill suffered increasingly worse sinus congestion and infections that could not be treated with antibiotics, ultimately requiring surgery to drain the infection, which her doctor cultured and identified as *Pseudomonas aeruginosa*. And although

---

[2] "Class Period" means the applicable statutes of limitations for Plaintiffs' claims.

she has not definitively suffered a physical injury at this time, Plaintiff Geschwind suffered economic injury by spending hundreds of dollars on worthless Products and by attempting to remediate a potential bacterial contamination in her home.

12.    Plaintiffs and other consumers reasonably relied on Defendant to sell products that are safe and free from harmful substances including harmful bacteria, and to truthfully inform and warn about Product dangers promptly and clearly. Plaintiffs and consumers would not have purchased and used worthless Products and would not have spent money and lost property attempting to remediate bacterial contamination if Defendant disclosed the risk that the Products were contaminated with dangerous bacteria. Furthermore, Plaintiffs Ostenfeld, Murphy (and her family), and Stilwill would not have suffered physical injuries if Defendant disclosed the truth. Consequently, Plaintiffs and the Class Members suffered injuries and damages due to Defendant's dangerous, deceptive, and unfair business practices.

13.    Based on Defendant's misconduct, Plaintiffs bring claims against Defendant for: violation of NY GBL §§ 349-50; breach of express warranty; breach of implied warranty; violation of the Magnuson-Moss Warranty Act ("MMWA"); Strict Products Liability—Design Defect; Strict Products Liability—Manufacturing Defect; Strict Products Liability—Failure to Warn; unjust enrichment; violations of California's Unfair Competition Law ("UCL"); and violation of California's False Advertising Law ("FAL");

14.    Plaintiffs bring claims on behalf of themselves and a national class of individuals who purchased Products during the Class Period ("Economic Injury Class"). Plaintiffs Murphy, Ostenfeld, and Stilwill bring claims on behalf of a national class of individuals who suffered

physical injuries after using Products during the Class Period ("Physical Injury Class") (together with the Economic Injury Class and California Subclass, "Classes").[3]

## PARTIES

**A.     Plaintiffs**

15.    Plaintiff Ostenfeld is, and was at all relevant times, a resident and citizen of New Jersey.

16.    Plaintiff Geschwind is, and was at all relevant times, a resident and citizen of New York.

17.    Plaintiff Murphy is, and was at all relevant times, a resident and citizen of California.

18.    Plaintiff Stilwill is, and was at all relevant times, a resident and citizen of Nebraska.

19.    Plaintiffs purchased recalled Products during the Class Period, reviewed the labeling, and used the Products as directed in the instructions without any knowledge that the Products were worthless because they were contaminated with, or were at risk of being contaminated with, dangerous bacteria.

20.    Plaintiffs suffered economic injury and lost money and property due to Defendant's misconduct. Plaintiffs would not have purchased the Products had they known that they were contaminated with, or at risk of being contaminated, with bacteria. Moreover, Plaintiff Geschwind lost additional money and property because of remediation efforts, and Plaintiffs Ostenfeld, Murphy, and Stilwill suffered physical injuries.

---

[3]      Plaintiff Murphy also brings California economic injury claims on behalf of California residents who purchased Products during the Class Period ("California Subclass").

**B.     Defendant**

21.     Defendant Laundress is a Delaware corporation with its principal place of business at 199 Prince Street, New York, New York 10012 and/or 247 West 30th Street, New York, New York 10001. When acquiring Laundress in 2019, Unilever United States, Inc. ("Unilever") stated Laundress "will continue to operate from their New York City headquarters with the co-founders remaining in place to lead the business and their NYC Flagship store in Soho."

22.     From its New York headquarters in this District, Laundress's management oversaw the production, distribution, and sale of the Products throughout the United States. Laundress's sales and marketing leadership, as well as its accounting, financial, and legal departments, are all based in its New York headquarters in this District. Furthermore, upon information and belief, Laundress's marketing, marketing analysis, and sales and financial documents were created and are located at its New York headquarters in this District.

23.     Upon information and belief, Laundress created and/or authorized the false and misleading representations and omissions from New York. Laundress and its management—from its New York headquarters—collaborated in developing, manufacturing, and distributing the Products, and the December 2022 recalls of the Products, with the Products' labeling uniformly stating "New York" under Laundress's name.

24.     Defendant's substantial participation in designing, manufacturing, distributing, marketing, and selling the Products from its New York headquarters means New York has the greatest interest in the subject matter of this lawsuit.

<u>**JURISDICTION AND VENUE**</u>

25.     This Court has original jurisdiction over this case under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). Minimal diversity exists between members of the proposed Classes

and Defendant. Defendant is a citizen of New York and Delaware. Plaintiffs are citizens of California, New York, New Jersey, and Nebraska. The amount in controversy in this action exceeds $5,000,000, exclusive of interest and costs, and there are more than 100 members in the proposed Classes.

26.     This Court also has original jurisdiction under 28 U.S.C. 1332(a) over Plaintiffs Murphy, Ostenfeld and Stilwill's claims. Complete diversity exists between Plaintiffs Murphy, Ostenfeld and Stilwill and Defendant. Defendant is a citizen of New York and Delaware Plaintiffs Murphy, Ostenfeld and Stilwill are citizens of California, New Jersey, and Nebraska. The amount in controversy exceeds $75,000, exclusive of interest and costs, for Plaintiff Murphy, Ostenfeld and Stilwill's claims, individually

27.     This Court has personal jurisdiction. Laundress's principal place of business is in New York, and/or Defendant is engaged in systematic and continuous business activity in New York, has sufficient minimum contacts in New York, or otherwise intentionally avails itself of the New York consumer market.

28.     Venue is proper in this District pursuant to 28 U.S.C. § 1391. Laundress's principal place of business is located in this District, and a substantial portion of the events or omissions giving rise to Plaintiffs' claims occurred in this District, including oversight of the production, distribution, and sale of the contaminated Products.

## FACTUAL BACKGROUND

**A.     Defendant, the Products, and Misrepresentations and Omissions**

29.     During the Class Period, Defendant manufactured, distributed, marketed, and sold millions of contaminated Products throughout the United States at premium prices based on a widespread advertising campaign highlighting the Products' purported natural, non-toxic, eco-friendly, and green attributes. For example, one gallon of Laundress Signature Detergent costs

approximately $94 per unit versus one gallon of Tide Original laundry detergent which sells for approximately $37 on Amazon.com.

30.     Laundress was founded in 2004 by Gwen Whiting and Lindsey Boyd, New York fashion executives who "set out to revolutionize laundry." On its website, Laundress claims it "introduce[ed] a pioneering collection of fabric-specific scented products with sophisticated fragrances that extend the lifespan of clothing and eliminate the chemicals and cost of dry-cleaning." After it was founded, Laundress eventually became "known for its luxury, non-toxic and cruelty free soaps and detergents . . . ." [4]

31.     In January 2019, Unilever acquired Laundress for $100 million based on the Laundress's reputation as a premium seller of natural, eco-friendly premium products, stating:

> Founded in 2004 by textile and fabric care experts Gwen Whiting and Lindsey Boyd . . . . The Laundress portfolio comprises 85 eco-friendly products across Laundry and Home Cleaning, which expands Unilever's portfolio in the growing top end of the Home Care market and fits greatly with Unilever's Sustainable Living Plan.
>
> ***
>
> Gwen Whiting, co-founder of The Laundress said: . . . . We set out to create our own alternatives, producing a highly effective, non-toxic line of fabric care and home cleaning products." [5]

32.     During the Class Period, Laundress set itself apart in the competitive cleaning and laundry product market through a widespread marketing campaign emphasizing purported natural, non-toxic, eco-friendly, and green cleaning products that do not contain, or contain minimal, chemicals and allergens, including on labeling which highlights the Products as "Non-toxic,

---

[4] Lauren Silver, *Luxury lifestyle brand The Laundress tells customers to stop using its products*, FOX13 (Nov. 21, 2022), https://www.fox13memphis.com/news/trending/luxury-lifestyle-brand-laundress-tells-customers-stop-using-its-products/FLMEKMRPQZG55AO4UHPLKEDO34/
[5] UNILEVER, *Unilever acquires The Laundress* (Jan. 27, 2019), https://www.unilever.com/news/press-and-media/press-releases/2019/unilever-acquires-the-laundress/.

biodegradable, and allergen-free:"



33.     During the Class Period, on its website, Defendant touted the Products as a non-toxic, safer alternative to dry cleaning:

> Dry clean only? No way. You've got this, and we can help. Nobody relishes the idea of wearing highly toxic dry cleaning chemicals against their skin along with their most delicate clothing items. Now there's a solution that is better for both you and the environment, all without ruining your treasured delicates. Washing delicates is easier than ever with Delicate Wash from The Laundress. It smells divine and easily removes odors while cleaning and preserving delicate fabrics. Visit our Clean Talk Blog for instructions on how to wash specific delicate items.

34.     During the Class Period, Defendant highlighted Laundress Products on social media as non-toxic, environmentally friendly, and safer, using hashtags like #greencleaning, #plantderived, and #ecoconscious to further the message that the Products are non-toxic and offer

an environmentally focused cleaning experience.



35.     During the Class Period, Defendant's non-toxic, natural ingredient-based, and eco-friendly marketing was echoed on the labeling and websites of the Products Plaintiffs purchased. For example, Laundress Classic Signature Detergent labeling/website stated:

> Our start-to-finish laundering collection in Classic scent is the ultimate "clean laundry smell," blending lily of the valley and jasmine with sweet musk, sandalwood, and a touch of citrus.

36.     Laundress Scented Vinegar labeling/website stated:

> Plant-derived formula with no unnecessary additives.
>
> Vinegar is known for its powerful cleansing properties that fight stains, buildup, and odors. However, it's also known for its off-putting "vinegary" smell. Combining our popular No. 247 scent with vinegar, this multipurpose product gets glassware to sparkle, easily removes bathtub film, effectively tackles messes and odors in the kitchen, and more!

37.     Laundress Fabric Fresh Class labeling/website stated:

> Keep clothes in rotation! This plant-derived formula adds a crisp, fresh scent to fabrics between washes while removing odor. It's also ideal for deodorizing bedding, outerwear, car interiors, sneakers, and luggage, and works to freshen up closets and drawers, too.

38.     Defendant's marketing successfully cultivated a loyal customer base of consumers

(including Plaintiffs) who seek non-toxic cleaning products and are willing to pay a substantial price premium to obtain non-toxic, supposedly safer cleaning products. Indeed, consumers are known to fill entire shelves at home with the Products.

39.     At least as early as the beginning of the Class Period, Defendant's representations were false and/or misleading as incomplete or only partially true. Contrary to Defendant's representations, the Products were not non-toxic due to bacterial contamination and/or the systemic and undisclosed flaws in Product design and manufacturing that made the products unreasonably susceptible and unreasonably at risk of bacterial contamination.

40.     At least as early as the beginning of the Class Period, Defendant failed to disclose on Product packaging and labeling (including in the ingredients section) or otherwise that the Products contained or were at risk of containing highly dangerous and toxic bacteria. Relatedly, Defendant provided no warning or instructions on Product packaging or labeling or otherwise that the Products contained bacteria; were at risk of containing bacteria; or the signs and what to do if a user suspected an infection.

**B.  Life-Threatening Dangers of the Bacteria Identified by Defendant**

41.     In November and December 2022, Defendant admitted that the Products "can contain bacteria, including *Burkholderia cepacia* complex, *Klebsiella aerogene*s and multiple different species of *Pseudomonas*[,]" three life-threatening types of bacteria.[6]

42.      *Pseudomonas* contains more than 140 species, with more than 25 species associated with humans. *Pseudomonas aeruginosa*, a citrate-positive[7] species of *Pseudomonas*, can cause severe infections in the lungs, skin, and other soft tissues. *Pseudomonas aeruginosa*

---

[6] https://www.thelaundressrecall.com/.
[7] A "citrate positive" bacterium can use citrate as a sole carbon source for growth,

exposure also presents a risk of death, with one study suggesting a 39% mortality rate.[8][9][10]

43.     For example, in 2016, *Pseudomonas aeruginosa* caused a deadly outbreak that killed multiple infants at a Maryland hospital; In 2017, antibiotic resistant *Pseudomonas aeruginosa* was responsible for 32,600 estimated cases in hospitalized patients and 2,700 estimated deaths; and in 2019, an outbreak of the bacteria at a Pennsylvania hospital took the lives of multiple infants.

44.     *Pseudomonas aeruginosa* poses particular dangers for immunodeficient individuals, that is, individuals whose immune systems' ability to fight infectious diseases and cancer is compromised. Serious infection occurs due to *Pseudomonas aeruginosa*'s ability to form aggregations commonly known as biofilms, with research indicating that *Pseudomona aeruginosa* can persist on inanimate surfaces for months.[11]

45.     Antibiotic resistance is one of *Pseudomonas aeruginosa*'s most dangerous aspects. In 2017, the World Health Organization ("WHO") listed *Pseudomonas aeruginosa* as one of twelve antibiotic resistant bacteria that "pose the greatest threat to humanity." In 2019, the United States Centers for Disease Control and Prevention identified *Pseudomonas aeruginosa* as a

---

[8] Yohei Migiyami, et al., *Pseudomonas aeruginosa Bacteremia among Immunocompetent and Immunocompromised Patients: Relation to Initial Antibiotic Therapy and Survival*, Jpn J Infect. Dis., 2016; 69(2):91-6, accessible at: https://pubmed.ncbi.nlm.nih.gov/26073727/.

[9] S. Sudharsanam, *Airbone Pseudomonas species in Healthcare Facilities in a Tropical Setting*, Curr Health Sci J.,2015 Apr-Jun; 41(2): 95-103, accessible at: https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6201198/; *see also* https://www.endosan.com/pseudomonas-aeruginosa-causes-symptoms-transmission-and-infection-prevention

[10] Cheol-In Kang, Sung-Han Kim, Hong-Bin Kim, Sang-Won Park, Young-Ju Choe, Myoung-don Oh, Eui-Chong Kim, Kang-Won Choe, *Pseudomonas aeruginosa Bacteremia: Risk Factors for Mortality and Influence of Delayed Receipt of Effective Antimicrobial Therapy on Clinical Outcome*, CLINICAL INFECTIOUS DISEASES, Volume 37, Issue 6, 15 September 2003, Pages 745–751, https://doi.org/10.1086/377200.

[11] Axel Kramer, *How long do nosocomial pathogens persist on inanimate surfaces? A systematic review*, BMC Infect Dis., 2006; 6:130, accessible at: https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1564025/

serious antibiotic resistant threat. *P.aeruginosa* is a "superbug" because it "mutates at an incredibly high rate, allowing [the] bacteria to quickly evolve antibiotic resistance."[12]

46.     *Burkholderia cepacia* complex, or simply *Burkholderia cepacia*, is bacteria composed of at least 20 different species. Like *P. aeruginosa*, *Burkholderia cepacia* is an opportunistic human pathogen that most often impacts the immunocompromised.

47.     *Burkholderia cepacia* causes lung infections, rapid lung decline, and pneumonia, particularly in immunocompromised individuals with underlying lung disease. *Burkholderia cepacia* can survive for prolonged periods in moist environment and are often resistant to common antibiotics. Furthermore, *Burkholderia cepacia* displays a remarkable ability to digest oil and some strains of *Burkholderia cepacia* can tolerate high salinity.

48.     *Klebsiella aerogenes* is citrate positive bacterium. *Klebsiella aerogenes* is another opportunistic human pathogen that causes various infections, particularly in immunocompromised individuals. Some *Klebsiella* bacteria have become highly resistant to antibiotics and can be very difficult to treat, including *Klebsiella aerogenes*.

49.     The nature and intended uses of the Products compound infection risk. Defendant represented the near-ubiquitous cleaning utility of the Products and directed consumers to use various Products together to improve cleaning utility. As a result, during the Class Period, users spread numerous contaminated Products on their clothes, surfaces, and in the air, substantially increasing the risk that the bacteria will proliferate and cause infection.

---

[12] University of Oxford, *Common drug-resistant superbug develops fast resistance to 'last resort' antibiotic* (June 7, 2022), https://www.ox.ac.uk/news/2022-06-07-common-drug-resistant-superbug-develops-fast-resistance-last-resort-antibiotic.

**C.      The Products Were Contaminated or at Risk of Contamination Long Before Defendant's Recall and Defendant Knew of those Risks**

50.      Defendant alone knows the ingredients and raw materials (as well as the sources and integrity of its ingredients and raw materials) used in manufacturing the Products; its Product designs and formulations; the Products' manufacturing processes; and the risks associated with the Products, including the risk of bacterial contamination.

51.      Plaintiffs and other consumers did not and could not know of latent dangers arising from the Products' designs, formulation, or manufacturing processes, including the risk that the Products were contaminated or at unreasonable risk of bacterial contamination. Moreover, Plaintiffs could not reasonably discover the contamination or the unreasonable risk of contamination through inspection or other reasonable means.

52.      Defendant, as a sophisticated and prominent manufacturer of consumer and professional cleaning products, has access to cutting-edge research and technology. Moreover, Defendant is subject to regulatory and internal quality assurance programs that—when properly implemented—should identify existing and emerging risks to its Products and consumers. As a result, Defendant is acutely aware of potential risks inherent in their Product designs, to their manufacturing processes, and to the ultimate consumers of the Products.

53.      The risk that the Products were susceptible to bacterial contamination was readily foreseeable to and detectable by Defendant. The risks of bacterial contamination have been known and extensively studied in the manufacturing industry long before the contamination here.

54.      Generally, all products containing water and organic/inorganic compounds under appropriate physicochemical conditions, are exposed to microbial contamination. Bacteria can be introduced in manufacturing processes due to improper sanitation practices; ingredients that encourage growth of microorganisms; and ineffective preservative systems, as just a few

examples. Bacterial contamination can also occur in the absence of preservatives or biocides or where improper or inadequate preservatives or biocides are used.

55.      Bacterial contamination has resulted in product recalls for decades. For instance, an analysis of FDA enforcement reports from 2012 to 2019 found that 87% of recalls for sterile drugs were associated with microbial contamination. In the cosmetic and food manufacturing industries, between 1993 and September 1998, microbial contamination accounted for a total of 1,370 recalls (36% of all products recalled). Likewise, the European Commission's RAPEX database (which is the EU's rapid alert system for unsafe consumer products), identified sixty-two (62) recalls of cosmetic products between 2008 and 2014.

56.      The Products' unique attributes make them particularly susceptible to bacterial contamination. *Pseudomonas* and *Klebsiella* are citrate positive. Similarly, *Burkholderia cepacia* digest oils and tolerates high salinity. In turn, the Products contain citrus-based chemicals and contain other ingredients, including essential oils, that greatly promote bacterial growth.[13] The Products thus provide a rich medium that favors bacterial growth due to the presence of water and citrus-based and organic/inorganic ingredients that bacteria use as an energy source.

57.      To the extent Defendant's Products do not contain the foregoing ingredients, the Products are at unreasonable risk of cross-contamination due to overlapping manufacturing processes, a cross contamination risk Defendant should have been aware of long before the Class Period and the contamination at issue.

58.      Based on the foregoing, Defendant was obligated to design and formulate the Products to prevent the foreseeable risk of bacterial contamination.

---

[13]      Many of Defendant's products are water-based, and Defendant touts that the Products contain the "purest, most ethically viable, natural, raw ingredients—with some blends containing over 20 different essential oils. Selecting plants nurtured in the best environments ensures they release the finest oils. Zestful citrus fruits, precious woods, fragile petals, and pungent spices all give up their prized oils under this craftsman's watchful eye."

59.     Defendant was also required to manufacture the products to prevent the foreseeable risk of bacterial contamination, including by implementing rigorous quality control measures that have long been understood to prevent microbial contamination during manufacturing processes, including:

    a.  Design of manufacturing processes that minimize microbial contamination;

    b.  Microbial risk assessment of raw materials and finished ingredients;

    c.  Development of effective audit checklists focused on microbial control;

    d.  In-person audits of production;

    e.  Supplier quality agreements established with a focus on microbial control;

    f.  Control of storage conditions post-production, warehouses, and during transit;

    g.  Effective maintenance and hygiene of facilities and equipment;

    h.  Effective cleaning of equipment and facilities;

    i.  Control of containers used to store and ship materials;

    j.  Control of supply chain, water systems, and wastewater and waste;

    k.  Development of pasteurization or sterilization processes;

    l.  Development of microbial test methods and specifications; and

    m.  Effective investigation of microbial contamination.

60.     The contamination in this case did not occur overnight or in limited batches or lots of Products. Instead, in November and December 2022, Defendant revealed that Product contamination dated back nearly two years to at least January 2021 with eight (8) million units of Products impacted and that Defendant was "aware of 11 consumers who have reported Pseudomonas infections and [were] investigating these reports to see if there is any connection to the recalled products."

61.     Even though Defendant suggested that the contamination was limited to Products produced after January 2021, Defendant recalled <u>all</u> existing Products, including Products

produced prior to January 2021. To confuse matters further, Defendant did not indicate whether pre-January 2021 Products were contaminated or why a recall of those Products was necessary.

62. The duration and scope of the contamination at issue in this case (every existing Product for 250 Product lines) strongly indicates a catastrophic or systemic failure in the Products' design and specifications or Defendant's manufacturing processes during the Class Period. Defendant has still not resumed production or sold the Products even though Defendant notified consumers to stop using the Products over five months ago.

63. As demonstrated by Defendant's November safety notice and December 2022 recall (discussed further below), the Products were unreasonably dangerous and unfit for sale due to a design or formulation defect that made the Products susceptible to bacterial contamination.

64. The Product's defective design could have been reduced or avoided entirely by adopting a reasonable alternative design, including adding a preservative or antimicrobial or biocidal agent such as isothiazolones, bronopol, aldehydes, and carboxylic acids. Those preservatives and agents are commonly included in household cleaning products to extend the shelf-life of cleaning products.

65. To the extent the Products already included preservatives or antimicrobial or biocidal agents, the Products' defective design could have been reduced or avoided entirely by increasing the amount or combination of preservatives or antimicrobial or biocidal agents; by including alternative preservatives or antimicrobial or biocidal agents; and/or by including a biocidal treatment for raw or finished materials.

66. In the alternative, during the Class Period, the Products were unreasonably dangerous and unfit for sale due to a manufacturing defect that made the Products susceptible to bacterial contamination. The Products deviated from Defendant's design specifications by *inter*

*alia* including contaminated raw materials, water, or other ingredients; improper hygiene; inadequate testing and audit procedures, and/or poor shipping or storage conditions.

67.     Moreover, the duration and scope of contamination raises only two plausible possibilities regarding Defendant's knowledge of the substantial risk of Product contamination from at least January 2021 until November and December 2022. Starting in at least the beginning of the Class Period, Defendant knew and ignored the Products' bacterial contamination (and consumer injury reports indicating bacterial contamination) or knew of and ignored the systemic design and/or manufacturing issues with the Products and their unreasonable susceptibility to contamination, ignoring or downplaying those risks to prevent a complete halt of production and sales, all at the great expense of consumer health.

68.     Defendant's knowledge is demonstrated by the breadth of its recall and its continuing equivocation and misleading disclosures when implementing the recall. While Defendant suggested that the contamination includes Products produced after January 2021, Defendant issued a recall of all existing Product (including pre-January 2021 products) without indicating to at-risk consumers whether those Products contain bacteria. Defendant has still not resumed production, indicating a design or manufacturing defect so serious Defendant must have known and ignored that risk at least as early as the beginning of the Class Period.

69.     On December 27, 2022, Defendant disclosed that a "further in-depth review has identified that The Laundress fabric conditioners might contain an impurity (ethylene oxide) at a low level that nonetheless exceeds our internal company standards."

70.     On March 31, 2023, Defendant issued what it referred to as an "update" regarding the Products' ethylene oxide contamination, stating "[Laundress] fabric conditioners can contain a chemical impurity, ethylene oxide, a carcinogen that can cause adverse health effects if there is significant and direct long-term exposure," that is, the precise type of exposure Defendant

subjected Plaintiffs and other consumers to here by engaging in a protracted course of misrepresentations and omissions. Defendant disclosed that over 800,000 units were impacted by the ethylene oxide contamination. and suggested a risk so severe that consumers should "not empty [Products] prior to disposal."

71.     Defendant's equivocations and the highly suspicious timing of second and third recall announcements further demonstrate Defendant's knowledge of widespread design and/or manufacturing flaws that eventually led to bacterial and ethylene oxide contamination. It is not possible that Defendant was unaware of the serious issues that led to the double-contamination of over eight million products over a nearly two-year span (at least), particularly when Defendant was receiving reports of *Pseudomonas* infection from consumers during the Class Period. Instead, Defendant must have known of and consciously ignored or concealed those risks to protect its own business interests.

72.     Therefore, at least as early as the beginning of the Class Period, Defendant understood that the Products were contaminated and/or understood the substantial and unreasonable risks of contamination inherent in the Products' design or in Defendant's manufacturing processes. Defendant chose not to remedy the issue(s) to maintain its existence and the status quo even though the costs and viability of remediating Product issues was necessary and reasonable considering the substantial and actual risk of injury to consumers.

73.     Defendant also understood that once it revealed that the Products contained bacteria or were at unreasonable risk of bacterial contamination, it would have to halt production and sales and place the existence of Laundress's business in question. Defendant sought to avoid those outcomes by concealing or downplaying bacterial contamination risks that became public in November and December 2022.

**D.      Defendant Had a Duty to Disclose the Risk of Bacterial Contamination**

74.      From at least the beginning of the Class Period, Defendant had a duty to disclose to, and warn, consumers, including Plaintiffs, that the Products were contaminated with bacteria; of injury reports indicating bacterial contamination; and/or of the systemic risks in Product design or manufacturing which made the Products unreasonably susceptible to bacterial contamination.

75.      During the Class Period, Defendant possessed exclusive and superior knowledge, not discoverable by Plaintiffs (including through reasonable inspection), regarding consumer injury reports, bacterial contamination, and/or the systemic flaws in Product design or manufacturing that made the Products unreasonably susceptible to bacterial contamination. Therefore, Defendant had a duty to disclose its superior knowledge of bacterial contamination risks but did not disclose that information to wrongly protect its business.

76.      During the Class Period, Defendant made incomplete and false representations that required a corrective and complete disclosure regarding consumer injury reports, bacterial contamination, the substantial risk that the Products were contaminated with bacteria, and/or the systemic and catastrophic flaws in Product design or manufacturing that made the Products unreasonably susceptible to bacterial contamination. Among other things, Defendant represented on Product labeling, packaging, and in other promotional materials that the Products were "Nontoxic, biodegradable, and allergen-free." However, Defendant failed to disclose consumer injury reports and the Product's unreasonable risk of bacterial contamination even though the actual circumstances ran contrary to Defendant's misleading and incomplete representations.

77.      Moreover, during the Class Period, Defendant actively concealed consumer injury reports, bacterial contamination, and/or the systemic and catastrophic flaws in Product design or manufacturing that made the Products unreasonably susceptible to bacterial contamination. Defendant knew that if it disclosed that the Products contained bacteria or were at risk of

containing bacteria, Plaintiffs and members of the Classes would not have purchased or used the Products. To selfishly protect its business, Defendant concealed the risk of contamination on product packaging or labeling and in other promotional mediums. Even now, Defendant refuses to clearly disclose the scope of Product contamination and whether pre-January 2021 Products are at risk of bacterial contamination, instead stating that "a broad product withdrawal" was part of Defendant's "renewed commitment to product quality."

78.    Defendant's misrepresentations and omissions were material because consumers are very concerned with ingredients and their health and safety and want to know whether a product is contaminated with bacteria or at risk of bacterial contamination.

**E.    In November 2022 and December 2022, Defendant Disclosed the Bacterial Contamination and Implemented Insufficient Product Recalls**

79.    On November 17, 2022, on its social media pages and through other promotions channels, Defendant issued a safety notice to consumers "to immediately stop using all The Laundress products in your possession." Laundress stated that it "identified the potential presence of elevated levels of bacteria in some of our products that present a safety concern."

80.    On December 1, 2022, Defendant recalled the Products, stating "[t]he recalled products can contain bacteria, including *Burkholderia cepacia* complex, *Klebsiella aerogenes* and multiple different species of *Pseudomonas*." In recalling the Products, Defendant noted "[p]eople with weakened immune systems, external medical devices, and underlying lung conditions who are exposed to the bacteria face a risk of serious infection that may require medical treatment. The bacteria can enter the body if inhaled, or through the eyes or a break in the skin."[14] Defendant stated that it was "aware of 11 consumers who have reported *Pseudomonas* infections and [was]

---

[14]    *See*    https://www.cpsc.gov/Recalls/2023/The-Laundress-Recalls-Laundry-Detergent-and-Household-Cleaning-Products-Due-to-Risk-of-Exposure-to-Bacteria;

investigating these reports to see if there is any connection to the recalled products." Defendant informed consumers to dispose of the Products in the household trash without emptying them.

81.     On December 27, 2022, Defendant issued a second recall, this time stating, "a further in-depth review has identified that The Laundress fabric conditioners might contain an impurity (ethylene oxide) at a low level that nonetheless exceeds our internal company standards." On March 31, 2023, Defendant "updated" its second recall, noting that 800,000 Products were contaminated with ethylene oxide and again informing consumers to immediately stop using the Products and to dispose of the Products in the household trash without emptying the Products.

82.     Defendant ultimately recalled eight (8) million bottles of the Products, encompassing roughly 250 product lines. As of December 2, 2022, "testing has identified bacteria in certain recalled products, including those produced between January 2021 and September 2022." Even though Defendant suggested the bacterial contamination dated back to January 2021, Defendant recalled every existing Product, including those produced prior to January 2021. Defendant did not state whether pre-January 2021 products were at risk of bacterial contamination but, instead, confusingly suggested that Defendant "decided to take additional steps to begin restarting The Laundress with a renewed commitment to product quality by implementing a broad product withdrawal."

83.     Defendant's recall of the Products does not provide an adequate remedy for Plaintiffs and the proposed Classes. As an initial matter, to receive compensation, consumers are required to have proof of purchase, either proof of direct purchase off Defendant's website, a receipt, and/or a picture of the Product's UPC and date code with initials. Without proof of purchase, consumers cannot receive a refund, even though many consumers necessarily used and discarded Products based on the duration of the contamination disclosed by Defendant (every existing Product, including Products sold before January 2021).

84.    Defendant's recall does not provide compensation to consumers, like Plaintiff Geschwind, who spent substantial time and money and discarded potentially contaminated property attempting to remediate bacterial contamination.

85.    On social media websites, consumers have been venting their frustration about the significant expense and time they spent to remediate potentially contaminated fabrics and surfaces. The scope of the damage to clothing is intensified because of the bacteria's long colonization periods and durability:

 **myblessedfarmhouse** @thehappygirl Same here- my Spring Summer clothes were just washed and out away until next year but now need to be rewashed? And my Fall/winter wardrobe taken out of storage, washed, air dried and now I need to wash it again. (Along with the other 9 members of my family!) it's a lot of laundry. And it's not like Laundress is going to pay the water and electricity bill!

 **thehappygirl** @axriannaaxx I'm so sorry. I get it. I laundered my whole summer wardrobe and ironed every single linen item with The Laundress. The thought of rewashing everything is overwhelming. This whole thing is overwhelming.

86.    In its recall FAQ, Defendant even recommended that immunocompromised individuals rewash clothing; suggested methods to clean potentially contaminated washers and dryers; and recommended that "concerned" consumers rewash dishes and surfaces with <u>alternative</u> products. Despite those instructions and recommendations, Defendant does not offer compensation for remediation expenses, including the purchase price of alternative products.

87.    Likewise, although Defendant recommended using its cleaning and laundry Products on delicate fabric items that cannot be exposed to hot water, intense heat, bleach, or other disinfectants that are necessary to kill bacteria, the recall does not compensate consumers for

24

discarding potentially contaminated property, including clothes and storage containers that cannot be safely worn or used again.

88.     Defendant's recall does not offer any compensation to consumers who were either physically injured by the Products or to consumers who need medical monitoring given the persistence of bacteria and the continuing risk of bacterial contamination and infection.

89.     Defendant's Product safety notice and recalls were inadequate to prevent injuries and damage. For consumers like Plaintiffs Ostenfeld, Murphy, and Stilwill who were physically injured prior to the safety notice and recalls, Defendant's attempt to warn of bacterial contamination or the risk of bacterial contamination was too little and too late. For consumers who were physically injured after the safety notice and recall, the channels used to convey the safety notice and recalls were either insufficient or too vague to reach at-risk consumers and/or the personal injuries suffered by those consumers were manifestations of latent infections that began prior to the November and December safety notice and recalls.

90.     Defendant's recall included participation by the CPSC and coincides with the timing and nature of similar recalls of cleaning products manufactured by Defendant's competitors. On October 25, 2023 (roughly three weeks prior to Defendant's safety notice and over a month before its own recall), the CPSC announced a recall by The Clorox Company involving 37 million scented units of its Pine-Sol products produced between January 2021 and September 2022, the same suggested period of the bacterial contamination here. On December 12, 2022, the CPSC announced AlEn USA LLC was recalling 14.5 thousand units of "Art of Green" laundry detergents, including the lavender scented variation. On February 8, 2023, the CPSC announced that Colgate-Palmolive Co. was recalling 4.9 million units of scented multi-purpose Fabuloso cleaners. In recalling the Fabuloso products, Colgate-Palmolive admitted that "Fabuloso is voluntarily recalling some of . . . Multi-Purpose Cleaners made in the United States because a

preservative was not added at the intended levels during manufacturing. With inadequate preservative, there is a risk of bacteria growth in the recalled products." Defendant here understood that risk—among many others—long before the Class Period in this case, and long before its December 2022 recall.

91.     The timing of Defendant's and its competitors' recalls and the intervention of the CPSC is more than a coincidence. Since the end of 2022, fifty (50) million units of primarily scented cleaning products manufactured on or after January 2021 have been recalled for potential bacterial contamination. Upon information and belief, in November 2022, Defendant understood that it could no longer conceal or downplay the existence and risk of bacterial contamination as well as the widespread design and/or manufacturing issues creating that risk based on the prior and forthcoming recalls and/or based on the interaction with the CPSC and/or other regulators. In November and December 2022, Defendant disclosed the bacterial contamination to avoid more severe consequences that would certainly arise if it continued to consciously ignore and/or conceal the contamination.

**F.      Plaintiffs' and Other Consumers' Product Purchases, Reliance on Defendant's Representations and Omissions, and Injuries**

Plaintiff Geschwind

92.     During the Class Period, Plaintiff Geschwind purchased contaminated Products that were subject to Defendant's recall directly from Defendant on TheLaundress.com, including—but not limited to—Laundress Classic Signature Detergent, Laundress Stain Solution, Laundress Glass & Mirror Cleaner, and Laundress Baby Detergent. Plaintiff Geschwind was exposed to the misleading representations and omissions enumerated in Section A, *supra*, including ingredient lists and labeling representations and warranties that the Products were "Nontoxic, biodegradable, and allergen free," as well as omissions regarding bacterial contamination, the risk of bacterial contamination, or the systemic flaws in Defendant's Product

design and manufacturing leading to bacterial contamination. Plaintiff Geschwind reviewed and relied on Defendant's representations and omissions when purchasing and using the Products and had no reason to believe the Products were contaminated.

93.     After Plaintiff Geschwind learned that Defendant's Products were contaminated with bacteria or at unreasonable risk of bacterial contamination, Plaintiff Geschwind purchased alternative laundry and cleaning products, rewashed all the laundry in her home, and cleaned out all the closets in her home, a costly and time-consuming endeavor. Plaintiff Geschwind disposed of hundreds of dollars' worth of hangers and containers used to store contaminated clothing.

94.     Had Defendant not made the false and misleading representations and omissions regarding the Products, Plaintiff Geschwind would not have purchased or used the Products, as the Products were worthless and presented severe risks of bodily injury. Moreover, due to the persistent nature of the bacteria (which can survive on surfaces for months), Plaintiff Geschwind is still at risk of contamination and infection. Accordingly, Plaintiff Geschwind was injured in fact and lost money because of Defendant's improper conduct, and Defendant's recall does not provide adequate relief.

Plaintiff Murphy

95.     During the Class Period, Plaintiff Murphy purchased contaminated Products that were subject to Defendant's recall from e-commerce stores such as FabFitFun.com, including—but not limited to—the Delicate Wash, the Crease Relief Spray, and the Signature Detergent. Plaintiff Murphy was exposed to the misleading representations and omissions enumerated in Section A, *supra*, including ingredient lists and labeling representations and warranties that the Products were "Nontoxic, biodegradable, and allergen free," as well as omissions regarding bacterial contamination, the risk of bacterial contamination, or the systemic flaws in Defendant's Product design and manufacturing leading to bacterial contamination. Plaintiff Murphy reviewed

and relied on Defendant's representations and omissions when purchasing and using the Products and had no reason to believe the Products were contaminated.

96.     Plaintiff Murphy saw and relied on the representations and warranty that the product would be a "non-toxic" and "better for you" alternatives to other cleaning methods like dry cleaning. Plaintiff understood these representations to mean that the Products did not contain harsh, harmful, or toxic ingredients. At the time of purchase, Plaintiff did not expect that the cleaning supplies purchased would contain a bacterium with deadly consequences. However, after using contaminated Products, Plaintiff Murphy and her family were physically injured by the Products. Between 2021 and 2022, Plaintiff Murphy and her family began experiencing respiratory infections, skin infections, rashes, and hives. Plaintiff Murphy's injuries occurred prior to Defendant's safety notice and recall and are associated with and were caused by bacterial contamination.

97.     Had Defendant not made the false and misleading representations and omissions regarding the Products, Plaintiff Murphy and her family would not have purchased, used, or been physically injured the Products, as the Products were worthless and presented severe risks of bodily injury due to contamination. Moreover, due to the persistent nature of the bacteria (which can survive on surfaces for months), Plaintiff Murphy is still at risk of contamination and infection. Accordingly, Plaintiff Murphy was injured in fact and lost money because of Defendant's improper conduct, and Defendant's recall does not provide adequate relief.

Plaintiff Ostenfeld

98.     During the Class Period, Plaintiff Ostenfeld purchased contaminated Products that were subject to Defendant's recall directly from Defendant on TheLaundress.com and other retailers, including—but not limited to—Laundress Scented Vinegar and approximately twenty

other Laundress Products. Plaintiff Ostenfeld was exposed to the misleading representations and omissions enumerated in Section A, *supra*, including ingredient lists and labeling representations and warranties that the Products were "Nontoxic, biodegradable, and allergen free," as well as omissions regarding bacterial contamination, the risk of bacterial contamination, or the systemic flaws in Defendant's Product design and manufacturing leading to bacterial contamination. Plaintiff Ostenfeld reviewed and relied on Defendant's representations and omissions when purchasing and using the Products and had no reason to believe the Products were contaminated.

99.     After using contaminated Products, Plaintiff Ostenfeld, an immunocompromised individual, was physically injured by the Products. In late 2021, Plaintiff Ostenfeld began experiencing—for the first time—skin irritation and persisting respiratory problems (including difficulty breathing, wheezing, and congestion, and shortness of breath), requiring ongoing medical attention. Plaintiff Ostenfeld's injuries occurred prior to Defendant's safety notice and recalls and are associated with and were caused by bacterial contamination.

100.    Had Defendant not made the false and misleading representations and omissions regarding the Products, Plaintiff Ostenfeld would not have purchased, used, or been physically injured by the Products, as the Products were worthless and presented severe risks of bodily injury due to contamination. Moreover, due to the persistent nature of the bacteria (which can survive for months), Plaintiff Ostenfeld is still at risk of contamination and infection. Accordingly, Plaintiff Ostenfeld was injured in fact and lost money because of Defendant's improper conduct, and Defendant's recall does not provide adequate relief.

Plaintiff Stilwill

101.    During the Class Period, Plaintiff Stilwill purchased contaminated Products that were subject to Defendant's recall from The Container Store, including—but not limited to—

Laundress Delicate Wash Lady, Laundress Fabric Fresh Class, and Laundress Fabric & Room Spray Classic. Plaintiff Stilwill was exposed to the misleading representations and omissions enumerated in Section A, *supra*, including representations on Product labeling that the Products were "Nontoxic, biodegradable, and allergen free," as well as omissions regarding bacterial contamination, the risk of bacterial contamination, or the systemic flaws in Defendant's Product design and manufacturing leading to bacterial contamination. Plaintiff Stilwill reviewed and relied on Defendant's representations and omissions when purchasing and using the Products and had no reason to believe the Products were contaminated.

102.    In October 2021, Plaintiff Stilwill began having increasingly worse sinus congestion and sinus infections. In February 2022, Plaintiff Stilwill was examined by her primary care physician who prescribed antibiotics and referred Plaintiff Stilwill to an Ear, Nose and Throat ("ENT") specialist. Plaintiff Stilwill's ENT performed a CT scan showing a sinus infection in Plaintiff Stilwill's sphenoid sinuses. Plaintiff Stilwill's ENT prescribed antibiotics, but those antibiotics were ineffective, with Plaintiff Stilwill's severe sinus congestion and infection symptoms persisting. Plaintiff Stilwill's ENT scheduled surgery to open and drain Plaintiff's sinuses, ultimately performing that surgery on June 3, 2022. The infection was subsequently cultured and shown to be *Pseudomonas aeruginosa.*

103.    Had Defendant not made the false and misleading representations and omissions regarding the Products, Plaintiff Stilwill would not have purchased, used, or been physically injured by the Products, as the Products were worthless and presented severe risks of bodily injury due to contamination. Moreover, due to the persistent nature of the bacteria (which can survive for months), Plaintiff Stilwill is still at risk of contamination and infection. Accordingly, Plaintiff Stilwill was injured in fact and lost money because of Defendant's improper conduct,

and Defendant's recall does not provide adequate relief.

<u>Other Consumers</u>

104.    Like Plaintiffs, other consumers suffered economic injury after paying substantial money for worthless cleaning Products that presented severe risks of bodily injury due to contamination. Moreover, like Plaintiffs Ostenfeld, Murphy, and Stilwill, many other consumers were physically injured after using the Products, describing injuries associated with bacterial infections on social media websites after using the Products:



105.     Most tragically, in March 2023, two plaintiffs filed a wrongful death lawsuit on behalf of their infant daughter in the Superior Court of New Jersey (since removed to the United States District Court for the District of New Jersey), alleging that they purchased Laundress Products to protect the special-needs and immunocompromised infant "from germs, chemicals, and toxins" based on Defendant's promotion of the Products as "plant-based, toxin-free, and [able] to deliver the same results as the more toxic alternatives." *See Sites v. Unilever United States, Inc.*, No. 2:23-cv-01767, Dkt. 1 at 5 of 29 (D.N.J. filed on March 28, 2023). The *Sites* plaintiffs allege that their daughter inexplicably "developed rashes, eyelid infections/inflammation, pneumonia, ear infections, and was diagnosed with Blepharitis" and *Pseudomonas* and *Klebsiella aerogenes* infections after the parents had used the Products to clean numerous surfaces and fabrics, including the infant's medical equipment. *Id.* at 7 of 29.

106.     The foregoing consumers are just some of the (at least) hundreds of individuals who have been physically injured after using the Products.

## CLASS ALLEGATIONS

107.     Plaintiffs seek to represent and certify the following class:

> All United States residents who purchased Products during the Class Period ("Economic Injury Class").

108.     Plaintiffs Ostenfeld, Murphy, and Stilwill seek to represent and certify the following class:

> All United States residents who suffered physical injuries after using Products or being exposed to Products that were purchased during the Class Period ("Physical Injury Class").

109.     Plaintiff Murphy seeks to represent and certify the following subclass:

> All California residents who purchased Products during the Class Period ("California Subclass").

110.     The foregoing Classes exclude any judge or magistrate assigned to this case, Defendant, Defendant's officers, directors, legal representatives, successors, and assigns, and any entity in which Defendant has a controlling interest.

111.     Plaintiffs satisfy the requirements of Rule 23(a) and Rule 23(b).

112.     <u>Numerosity</u>: This proposed class action involves eight (8) million contaminated units of Defendant's Products and involves tens of thousands or hundreds of thousands of purchasers or more. Although the exact numbers are unknown to Plaintiffs, the number of individuals in the Classes far exceed forty (40) individuals and very likely amount to tens of thousands or hundreds of thousands of individuals in the Economic Injury Class and California Subclass and hundreds or thousands of individuals in the Personal Injury Class. As a result, the Classes are so numerous that joinder of all members is impracticable.

113.     The proposed classes are defined by objective criteria so that it is administratively feasible for the Court to determine whether a particular individual is a member. Individual class members can be identified through affidavits and/or reference to documents in Defendant's possession, custody, or control without resort to a mini-hearing on the merits.

114.     <u>Commonality</u>: The questions of law and fact common to Classes predominate over any questions which may affect individual members of those Classes and include:

a.     How Defendant's Products became contaminated;

b.     When and how Defendant knew or suspected that the Products were contaminated;

c.     Whether the Products designed, manufactured, and labeled by Defendant containing bacteria were safe for their intended use;

d.     Whether the Product's violated minimum consumers' minimum safety assumptions by being contaminated with bacteria;

e.     Whether the foreseeable risks of Products contaminated with bacteria exceeded the benefits associated with Products contaminated with bacteria;

f.      Whether the foreseeable risks posed by the contaminated Products have been avoided or reduced through a reasonable alternative design;

g.      Whether the Products deviated from design specifications or formulation;

h.      Whether Defendant knew or should have known about the risk that the Products were contaminated with bacteria or were at risk of contamination;

i.      Whether Defendant adequately warned consumers of the foreseeable danger that the Products were contaminated;

j.      Whether Defendant made false and/or misleading statements and omissions concerning the Products and the risks associated with those Products;

k.      Whether Defendant's conduct offended public policy or presented a substantial and unjustifiable risk of injury to consumers without providing any countervailing benefits; and

l.      Whether Plaintiffs and the Class are entitled to actual and compensatory damages, statutory damages, and medical monitoring.

115.    <u>Typicality</u>: Plaintiffs' claims are typical of those belonging to members of the Classes. Each Plaintiff purchased worthless Products containing or at risk of containing bacteria and suffered economic injury as a result. Moreover, Plaintiffs Ostenfeld, Murphy, and Stilwill used Products and suffered physical injuries as a result.

116.    <u>Adequacy</u>: Plaintiffs will fairly and adequately protect the interests of Classes. Plaintiffs have retained counsel experienced in complex class action litigation, and Plaintiffs and their chosen counsel have no interests adverse to those of the Classes.

<u>Rule 23(b)(1)</u>

117.    Class action status is warranted under Rule 23(b)(1)(A). Prosecuting separate actions by or against individual members of the Classes would create a risk of inconsistent or varying adjudications with respect to individual members of the Classes, which would establish incompatible standards of conduct for Defendant.

118.    Class action status is also warranted under Rule 23(b)(1)(B). Prosecuting separate actions by individual members of the Classes would create a risk of adjudications with respect to individual class members which would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications, or substantially impair or impede their ability to protect their interests.

Rule 23(b)(3)

119.    Common questions of law and fact exist as to every member of the Classes and predominate over any questions solely affecting individual members of the Classes, including the common questions identified above.

120.    A class action is also superior to other available means for the fair and efficient adjudication of this controversy for other reasons. The injuries suffered by individual members of the classes, though important to them, are relatively small compared to the burden and expense of individual prosecution needed to address Defendant's misconduct. Individualized litigation presents a potential for inconsistent or contradictory judgments. In contrast, a class action presents far fewer management difficulties; allows the hearing of claims that might otherwise go unaddressed; and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Individual class member's interests in individually controlling the prosecution of separate actions are outweighed by their interest in efficient resolution by a single class action, and it would be desirable to concentrate in this single venue the litigation of all class members who were induced to purchase and use the contaminated Products and were injured by Defendant's uniform misconduct.

Rule 23(c)(4)

121.    Alternatively, to the extent that class certification under Rule 23(a) and (b) cannot

be obtained (which cannot be determined at this stage of the case), the issues of fact or law (among many other issues of fact or law) identified in paragraph 114 above are common to all members of the Classes and can be resolved on behalf of the Classes through Rule 23(c)(4)

122.    Plaintiffs cannot be certain of the form and manner of proposed notice to members of the Classes until the Classes are finally defined and discovery is completed regarding the identity of class members. Plaintiffs anticipate, however, that notice by mail will be given to members of the Classes who can be identified specifically. In addition, notice may be published in appropriate publications, on the internet, in press releases and in similar communications to reach members of the Classes.

123.    Plaintiffs reserve their right to modify or amend the definition of the proposed Classes and to assert additional subclasses at any time before the Classes are certified by the Court.

## FIRST CLAIM FOR RELIEF
## VIOLATION OF NEW YORK GENERAL BUSINESS LAW §§ 349-50 ("GBL")

124.    Plaintiffs reallege and incorporate by reference the allegations elsewhere in the Complaint as if set forth fully herein.

125.    Plaintiffs bring this claim on behalf of themselves and the Economic Injury Class.

126.    NY GBL § 349 prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in [New York]." N.Y. Gen. Bus. Law § 349.

127.    NY GBL § 350 prohibits "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service in [New York.]"

128.    NY GBL § 350-a (1) defines "false advertising:"

The term "false advertising" means advertising, including labeling, of a commodity, or of the kind, character, terms or conditions of any

employment opportunity if such advertising is misleading in a
material respect.

129.     The New York Court of Appeals has indicated that New York consumer protection

statutes should be liberally construed to provide "needed authority to cope with the numerous,

ever-changing types of false and deceptive business practices which plague consumers in our

State." *Karlin v. IVF America, Inc.*, 690 N.Y.S.2d 495, 498 (N.Y. 1999).

130.     A violation of NY GBL §§ 349-50 occurs where: (1) the challenged transaction was

consumer-oriented; (2) a defendant engaged in deceptive or materially misleading acts or practices

likely to deceive a reasonable consumer acting reasonably under the circumstances; and (3) the

plaintiff was injured by reason of the defendant's deceptive or misleading conduct. The standard

for recovery under NY GBL § 350, while specific to false advertising (including labeling), is

otherwise identical to NY GBL § 349.

131.     The misconduct alleged above was consumer oriented. During the Class Period,

Defendant sold eight (8) million units of Products contaminated with bacteria or at unreasonable

risk of bacterial contamination, directly on its website and/or through online and physical retailers.

Moreover, Defendant's false and misleading representations and omissions were directed to and

the targeted consumers on a broad scale.

132.     The misconduct alleged above, including Defendant's false and misleading labeling

and promotion of the Products as "non-toxic," as well as the omissions and non-disclosures

regarding the Products' bacterial contamination, constitute deceptive or materially misleading acts

or practices likely to deceive a reasonable consumer acting reasonably under the circumstances,

including Plaintiffs and the Economic Injury Class. Defendant's false and misleading labeling and

promotion of the Products, as well as the omissions and non-disclosures, also constitute false

advertising for purposes of NY GBL § 350.

133.     Defendant's deceptive or materially misleading acts or practices under NY GBL §§ 349-50 proximately caused damage to Plaintiffs and Economic Injury Class Members. Defendant leveraged its deception to induce Plaintiffs and the Economic Injury Class to purchase products that were of lesser value and quality than advertised or were worthless. Plaintiffs and the Economic Injury Class reviewed and relied on Defendant's representations and omissions and were denied the benefit of the bargain when they decided to purchase the Products over competitor products which do not contain bacteria (or at risk of containing bacteria) and were safe to use. Had Defendant not made false and misleading statements and used false and misleading advertising tactics, Plaintiffs and the Economic Injury Class would have paid far less than what they did for the Products or would not have purchased the Products at all. Plaintiffs and members of the Economic Injury Class were misled and suffered injuries and lost money or property as a direct and proximate result of Defendant's unlawful business practices.

134.     Thus, under NY GBL § 349(h) and NY GBL 350-e, Plaintiffs are entitled to recover their actual damages or statutory (including statutory damages based on Defendant's willful or knowing violations), whichever is greater, along with reasonable attorneys' fees.

**SECOND CLAIM FOR RELIEF**
**BREACH OF EXPRESS WARRANTY**

135.     Plaintiffs reallege and incorporate the allegations elsewhere in the Complaint as if set forth fully herein.

136.     Plaintiffs bring this claim on behalf of themselves and the Economic Injury Class.

137.     During the Class Period, Defendant made representations to the public, including to Plaintiffs and the Economic Injury Class, by advertising, packaging, labeling, ingredient lists and other means, that the Products were "Nontoxic, biodegradable, and allergen-free" and did not contain bacteria such as *Burkholderia cepacia* complex, *Klebsiella aerogenes* and multiple

different species of *Pseudomonas*. Those promises and related promises became part of the basis of the bargain between the parties and thus constituted express warranties.

138.    Thereon, Defendant sold the goods to Plaintiffs and the Class, who bought the goods from Defendant. Plaintiffs reviewed and relied on Defendant's labeling, representations, and warranties when purchasing and using the Products, including Defendant's warranties on Product labeling and in ingredient lists that the Products were "Nontoxic, biodegradable, and allergen-free" Plaintiffs had no reason to believe the Products were contaminated.

139.    However, Defendant breached the express warranty in that the goods were contaminated with bacteria or at unreasonable risk of being contaminated with bacteria. As a result of this breach, Plaintiffs and the Class in fact did not receive goods as expressly warranted by Defendant.

140.    At least as early as the beginning of the Class Period, Defendant was on notice of its warranty breaches through interactions with regulatory agencies; at least eleven (11) consumer reports of injuries caused by the Products' bacterial contamination; and from other external and internal sources, including lawsuits arising from the Products' bacterial contamination.

141.    Plaintiffs were not required to provide Defendant with notice of its warranty breaches to the extent Defendant was acting as manufacturers of the Products; based on futility; and/or because Defendant was on notice of its breaches from other sources (as alleged above). However, in an abundance of caution, Plaintiffs Geschwind, Ostenfeld, and Stilwill, on behalf of themselves and the Economic Injury Class, provided Laundress's counsel with notice via electronic and certified mail on April 12, 2023, outlining the nature of Laundress's warranties and breaches and making a demand for relief. Plaintiff Murphy contacted—shortly after learning of the contamination of her products in November 2022—the seller of her most recent purchase of

the Product and alerted it to her displeasure with the deficiencies outlined herein. In their notices, Plaintiffs provided Defendant with an opportunity to cure its warranty breaches to no avail, as Defendant has not offered to compensate Plaintiffs and the Economic Injury Class for the injuries described in this Complaint.

142. Privity exists between Plaintiffs and Defendant to the extent Plaintiffs purchased Products directly from Defendant or its agents.

143. To the extent Plaintiff did not purchase Products directly from Defendant, privity between Plaintiffs and Defendant is not required because: (1) Defendant's warranties were included in public advertising and sales literature; (2) Plaintiffs reviewed and relied on Defendant's labeling and ingredient lists warranting that the Products were "Nontoxic, biodegradable, and allergen-free" and did not contain bacteria; (3) Plaintiffs were personally injured by the Products; and/or (4) the Products were consumer merchandise, were sealed, and/or contained a dangerous toxin. Moreover, Plaintiffs were the known end purchasers of the Products; the Products' implied warranties were intended for Plaintiffs' immediate benefit; and Plaintiffs were the intended third-party beneficiaries of the warranties between Defendant and the retailers who ultimately sold the Products to Plaintiffs. As a result, Defendant has a duty to compensate Plaintiffs for the warranty breaches.

144. Defendant's attempts to disclaim or limit the warranties vis-à-vis consumers are unenforceable based on vagueness, inconspicuousness, and unconscionability. Specifically, Defendant's warranty limitations are unenforceable because Defendant knowingly sold a defective product without informing consumers about bacterial contamination and/or the substantial risk of bacterial contamination. In addition, a gross disparity in bargaining power existed between

Defendant and members of the Classes, as only Defendant knew that the Products contained toxins at the time of sale and that the devices were not of merchantable quality.

<u>**THIRD CLAIM FOR RELIEF**</u>
**BREACH OF IMPLIED WARRANTY**

145.    Plaintiffs reallege and incorporate by reference the allegations elsewhere in the Complaint as if set forth fully herein.

146.    Plaintiffs bring this claim on behalf of themselves and the Economic Injury Class.

147.    Defendant, as the manufacturer, marketer, distributor, and/or seller of the Products, impliedly warranted, among other things, that the Products were merchantable, in that: (a) the Products would pass without objection in the trade under the contract description; (b) the Products were of fair average quality within the description; (c) the Products were fit for the ordinary purposes for which such goods are used; and (d) the Products conformed to the promise or affirmations of fact made on the containers or labels if any.

148.    Defendant breached the Products' implied warranties because the Products could not pass without objection in the trade under the contract description; the Products were not of fair or average quality within the description; the Products were unfit for their intended and ordinary purpose; and the Product did not conform to promises and affirmations of fact on the labeling including labeling and ingredient lists warranting that Products were "Nontoxic, biodegradable, and allergen-free" and did not contain bacteria. The Products were not merchantable and defective in that they contained ingredients that made the Products unreasonably dangerous, and as such are not generally recognized as safe for consumer use.

149.    Moreover, when Defendant offered and sold the Products, Defendant had reason to know that the Products would be used for cleaning and laundry purposes and that Plaintiffs were relying on Defendant's skill or judgment to select or furnish suitable goods for cleaning purposes.

150.    Instead of providing goods fit for cleaning purposes, the Products posed an unreasonable risk of bacterial contamination and personal injury. Plaintiffs and Economic Injury Class members purchased the Products in reliance upon Defendant's skill and judgment and the implied warranties of fitness for the purpose. Plaintiffs and Economic Injury Class members did not receive the goods as impliedly warranted by Defendant to be merchantable.

151.    The Products were not altered by Plaintiffs or Economic Injury Class members.

152.    The Products were nonconforming and defective when they left the exclusive control of Defendant.

153.    Defendant knew that the Products would be purchased and used without additional testing by Plaintiffs and Economic Injury Class members.

154.    The Products contained dangerous, undisclosed ingredients and were unfit for their intended purpose, and Plaintiffs and Economic Injury Class members did not receive the goods as warranted.

155.    As a direct and proximate cause of Defendant's breach of the implied warranty, Plaintiffs and Economic Injury Class members have been injured and harmed because: (a) they would not have purchased the Products or would not have purchased the Products on the same terms if they knew that the Products contained the toxins, making it unsafe for consumer use; (b) the Products do not have the characteristics, uses, or benefits as promised by Defendant; and (c) Plaintiffs and members of the Classes spent substantial time and money attempting to remediate bacterial contamination and suffered physical injuries after using the Products.

## FOURTH CLAIM FOR RELIEF
## VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT,
## 15 U.S.C. §§ 2301, *ET SEQ.*

156.    Plaintiffs reallege and incorporate by reference the allegations elsewhere in the Complaint as if set forth fully herein.

157.    Plaintiffs bring this claim on behalf of themselves and the Economic Injury Class.

158.    The Products are consumer products as defined in 15 U.S.C. § 2301.

159.    Plaintiffs and the Economic Injury Class are consumers as defined in 15 U.S.C. § 2301.

160.    Defendant is a supplier and warrantor as defined in 15 U.S.C. § 2301.

161.    In connection with the marketing and sale of the Products, Defendant expressly and impliedly warranted that the Products were merchantable, non-toxic, did not contain bacteria, and were fit for a particular purpose. The Products were not fit for use due to the presence of toxic substances described in the allegations above.

162.    By reason of Defendant's breach of warranties, Defendant violated the statutory rights due to Plaintiffs and the Economic Injury Class Members pursuant to the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq*., thereby damaging Plaintiff and Economic Injury Class Members.

163.    Plaintiff and Economic Injury Class members were injured as a direct and proximate result of Defendant's breach because they would not have purchased the Products if they knew the truth about the toxic nature of the Products.

164.    Despite notice by Plaintiffs and Economic Injury Class members to Defendant of the toxic nature of the Products, Defendant did not replace or repair the defective Products. Instead, the costs of the defects were borne by consumers.

165.    As a direct and proximate result of Defendant's breach of warranties pursuant to 15 U.S.C. § 2310(d)(1), Plaintiffs and Economic Injury Class Members have suffered damages in an amount to be proven at trial.

166.    Plaintiffs and Economic Injury Class members are entitled to recover damages as a result of Defendant's breach of warranties.

167.    Plaintiffs and Economic Injury Class Members are also entitled to seek costs and expenses, including attorneys' fees, under the MMWA. 15 U.S.C. § 2310(d)(2).

**FIFTH CLAIM FOR RELIEF**
**STRICT PRODUCTS LIABILITY: DESIGN DEFECT**

168.    Plaintiffs reallege and incorporate by reference the allegations elsewhere in the Complaint as if set forth fully herein.

169.    All Plaintiffs except Plaintiff Geschwind assert this claim on behalf of themselves and the Personal Injury Class.[15]

170.    Defendant is the manufacturer, distributor, and/or seller of the Products.

171.    A manufacturer, distributor, or seller may be held strictly liable for placing a defective product on the market if the plaintiff's injury results from a reasonably foreseeable use of the product, including injuries caused by a design defect that renders the product unreasonably dangerous for its intended use.

172.    A design defect exists when the product is built in accordance with its intended specifications, but the design itself is inherently defective under the consumer expectation and/or risk-utility test.

---

[15] The Court should not conduct a choice of law analysis at this early stage of the case. However, if the Court conducts a choice of law analysis and determines that Plaintiffs Murphy, Ostenfeld and Stillwell's claims are governed by the substantive law of their home-states (California, New Jersey, and Nebraska), then Plaintiff Ostenfeld brings her product liability claims pursuant to the New Jersey Products Liability Act.

Consumer Expectation Test

173.    The Products' design fails the consumer expectation test, which requires a product to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner.

174.    Here, the facts permit an inference that Plaintiffs could form minimum safety assumptions about the Products, including that the Products were safe and not contaminated with bacteria and would not cause bacterial infections and other related injuries when used for their intended cleaning purposes.

175.    The Products did not meet Plaintiffs' safety expectations. Although the Products are designed for repeated use and for generally applicable cleaning and laundry purposes throughout the home, contain water and other ingredients that promote bacterial growth, the Products did not contain a preservative or biocidal or antimicrobial agent; contained inadequate amounts of preservatives or biocidal or antimicrobial agents; contained an inadequate preservative profile; and/or lacked biocidal treatment of raw materials, ingredients or finished Products.

176.    The use of preservatives and biocidal or microbial agents and treatments are ubiquitous throughout the cleaning product industry, promote shelf-life, product integrity, and prevent bacterial contamination. The use of preservatives and biocidal or microbial agents or treatments do not alter the composition of cleaning products and are economically feasible and necessary considering the risks posed by product contamination and degradation.

Risk-Benefit Test

177.    The Products' design fails the risk-benefit test. A product is defective under the risk-benefit test if the plaintiff demonstrates that the product's design proximately caused his injury and that, on balance, the benefits of the challenged design outweigh the risk of danger inherent in

such a design. The relevant factors generally include: the gravity of the danger posed by the challenged design, the likelihood that such danger would occur, the mechanical feasibility of a safer alternative design, the financial cost of an improved design, and the adverse consequences to the product and to the consumer that would result from an alternative design.

178.    Plaintiffs used the Products as intended and as Defendant directed for cleaning and laundry purposes and suffered bacterial infections and related injuries due to the Products' bacterial contamination.

179.    In light of the relevant factors, on balance, the benefits of the challenged design (one without preservatives/biocidal/antimicrobial agents) far outweigh the risk of danger inherent in such design, including the gravity of the danger posed by the risk of bacterial contamination; the inevitability that bacterial contamination; the mechanical and economic feasibility of including preservatives/antimicrobial/biocidal agents and treatments; the low financial cost of an improved design; and the total lack of adverse consequences to the Products and consumers that would result from an alternative design.

Reasonable Alternative Design

180.    The unreasonable risk of bacterial contamination stemming from the Products' defective design could have been reduced or avoided entirely by the adoption of a reasonable alternative design, including the addition of a preservative or antimicrobial or biocidal agent.

181.    The Products' design defect (the lack of preservatives/biocidal/microbial agents or treatments and unreasonable susceptibility to bacterial contamination) existed when the Products left Defendant's hands, and Plaintiffs did not alter or modify the Products and used the Products as directed and in a reasonably foreseeable manner and suffered injuries, including bacterial infections and related injuries due to the Products' bacterial contamination.

182.    The Products' design defect proximately caused and were a substantial factor in causing Plaintiffs' injuries. Further, Defendant's actions and omissions as identified in this Complaint constitute a flagrant disregard for human life.

183.    Plaintiffs suffered harm and injuries due to Defendant's misconduct in an amount to be determined at trial.

## SIXTH CAUSE OF ACTION
## STRICT PRODUCTS LIABILITY: MANUFACTURING DEFECT

184.    Plaintiffs reallege and incorporate by reference the allegations elsewhere in the Complaint as if set forth fully herein.

185.    All Plaintiffs except Plaintiff Geschwind assert this claim on behalf of themselves and the Personal Injury Class.

186.    Defendant is the manufacturer, distributor, and/or seller of the Products.

187.    A manufacturer, distributor, or seller may be held strictly liable for placing a defective product on the market if the plaintiff's injury results from a reasonably foreseeable use of the product, including an injury caused by a manufacturing defect.

188.    A manufacturing or production defect occurs when a product is manufactured in a substandard fashion or when a product is one that differs from the manufacturer's intended result or from other ostensibly identical units of the same product line. The "manufacturing defect" theory posits that a suitable design is in place, but that the manufacturing process deviated from that design, rendering a product that is ordinarily safe dangerous so that it causes harm.

189.    Here, at the time the Products left Defendant's hands, the Products deviated from Defendant's intended result/design/specifications or deviated from other seemingly identical models, in one or more of the following ways:

a.  The Products contained contaminated raw materials, water or other ingredients leading to bacterial contamination;

b.  The Products and/or their constituent ingredients were cross contaminated by human or animal contact or raw materials, water or other ingredients leading to bacterial contamination;

c.  The Products' manufacturing and storage facilities were not kept sufficiently clean or were subjected to improper or inadequate hygiene techniques, leading to bacterial contamination;

d.  The Products were subject to inadequate or improper quality control, testing, and/or audit procedures, leading to bacterial contamination;

e.  The Products were subject to inadequate or improper shipping or storage conditions, leading to bacterial contamination; and/or

f.  The Products did not contain or receive the adequate or intended amount of preservatives/antimicrobial/or biocidal agents or treatment or contained or received an improper or inadequate preservative/biocidal/antimicrobial profile

190.   At this early stage, Plaintiffs cannot be sure of the precise design or manufacturing defect that led to the Products' bacterial contamination because the design and manufacturing process is uniquely within the knowledge and control of the Defendant as manufacturer, distributor, or seller. However, under no circumstances should the Products have been contaminated with bacteria, and it is certain that the Products suffered from a manufacturing and or design defect because they were contaminated with bacteria; caused Plaintiffs' injuries; and were recalled by Defendant due to safety concerns. Discovery will ultimately reveal the precise nature of the Products' design or manufacturing defect, but Defendant cannot avoid liability because it alone possesses knowledge and evidence of the source of the Products' contamination.

191.   The Products' manufacturing defect existed when the Products left Defendant's hands, and Plaintiffs did not alter or modify the Products.

192.   Plaintiffs used the Products as directed and in a reasonably foreseeable manner and suffered injuries, including bacterial infections and related injuries.

193.   The Products' manufacturing defect proximately caused and was a substantial factor in causing Plaintiffs' injuries, including bacterial infections and related injuries. Further, Defendant's actions and omissions as identified in this Complaint constitute a flagrant disregard for human life.

194.   Plaintiffs suffered injuries and harm because of Defendant's misconduct in an amount to be determined at trial.

## SEVENTH CAUSE OF ACTION
## STRICT PRODUCTS LIABILITY:
## FAILURE TO PROVIDE ADEQUATE WARNING

195.   Plaintiffs reallege and incorporate by reference the allegations elsewhere in the Complaint as if set forth fully herein.

196.   All Plaintiffs except Plaintiff Geschwind assert this claim on behalf of themselves and the Personal Injury Class.

197.   Defendant is the manufacturer, distributor, and/or seller of the Products.

198.   A manufacturer, distributor, or seller may be held strictly liable for placing a defective product on the market if the plaintiff's injury results from a reasonably foreseeable use of the product, including an injury caused by failure to warn or provide adequate instructions.

199.   A Product may be found defective within the general strict liability rule and its manufacturer or supplier held strictly liable because of the failure to provide an adequate warning or instruction where the manufacturer knew or should have known of the risk at the time of manufacturer.

200.   Whether a warning is adequate generally depends on several factors, among them the normal expectations of the consumer as to how a product will perform, degrees of simplicity or complication in its operation or use, the nature and magnitude of the danger to which the user

is exposed, the likelihood of injury, and the feasibility and beneficial effect of including a warning.

201.    Here, Defendant knew of or should have known of the risk that the Products were contaminated with bacteria or were at risk of bacterial contamination based on systemic flaws in Product design or manufacturing.

202.    The risk that the Products were contaminated or at risk of bacterial contamination due to inadequate Product design and manufacturing methods presented a substantial danger to Plaintiffs and other consumers when the Products were used in an intended or reasonably foreseeable way, including for cleaning purposes, and reasonable consumers, including Plaintiffs, would not have recognized those potential risks and had no reason to know of those potential risks.

203.    The Products manufactured, distributed, and/or sold by Defendant were defective due to inadequate warnings or instructions because Defendant failed to adequately warn consumers of contamination risks, including warnings that:

      a.    The Products were contaminated with bacteria;

      b.    The Products were at unreasonable risk of being contaminated with bacteria due to deficiencies in Product design and manufacturing methods and reports from other consumers or competitors; and

      c.    Potential signs of bacterial infection and what to do if a bacterial infection or contamination was suspected, including to stop using the Products immediately and consult a doctor.

204.    Defendant's inadequate or absence of the foregoing warnings and directions were a substantial factor in causing injuries to Plaintiffs and the Physical Injury Class. Plaintiffs and the Physical Injury Class reviewed Product labeling and instructions and used the Products as directed without any knowledge the Products were at risk of bacterial contamination and could cause injuries because Defendant did not include any warnings or instructions regarding those risks. Plaintiffs and the Physical Injury Class would not have purchased or used the Products had

Defendant included proper warnings and instructions on the risks of bacterial contamination.

205.    The Products' failure to warn or properly instruct on the risks of bacterial contamination proximately caused and were a substantial factor in causing Plaintiffs' injuries, including infections and related injuries stemming from the Products' bacterial contamination. Further, Defendant's actions and omissions as identified in this Complaint constitute a flagrant disregard for human life.

206.    Plaintiffs suffered injuries and harm because of Defendant's misconduct in an amount to be determined at trial.

### EIGHTH CAUSE OF ACTION
### UNJUST ENRICHMENT

207.    Plaintiffs reallege and incorporate by reference the allegations elsewhere in the Complaint as if set forth fully herein.

208.    Plaintiffs bring this claim on behalf of themselves and the Economic Injury Class.

209.    "Although there are numerous permutations of the elements of the unjust enrichment cause of action in the various states, there are few real differences. In all states, the focus of an unjust enrichment claim is whether the defendant was unjustly enriched. At the core of each state's law are two fundamental elements—the defendant received a benefit from the plaintiff and it would be inequitable for the defendant to retain that benefit without compensating the plaintiff. The focus of the inquiry is the same in each state." *In re Mercedes-Benz Tele Aid Contract Litig.*, 257 F.R.D. 46, 58 (D.N.J. Apr. 24, 2009) (quoting *Powers v. Lycoming Engines*, 245 F.R.D. 226, 231 (E.D. Pa. 2007)).

210.    At all times relevant hereto, Defendant deceptively marketed, advertised, and sold merchandise to Plaintiffs and the Economic Injury Class.

211.    The Products purchased by Plaintiffs and the Economic Injury Class did not provide

the promised performance and instead contained toxic substances.

212.    Plaintiffs and the Economic Injury Class conferred a benefit on Defendant by purchasing the Products and by paying a price premium for them.

213.    Defendant had knowledge of such benefits.

214.    Defendant has been unjustly enriched in retaining the revenues derived from Plaintiffs' and the Economic Injury Class's purchases of the Products, which retention under these circumstances is unjust and inequitable because Defendant misrepresented that the Products (i) would not contain toxic substances and (ii) is generally recognized as safe. These misrepresentations caused injuries to Plaintiffs and the Economic Injury Class because they would not have purchased the Products if the true facts regarding the Products were known.

215.    Because Defendant's retention of the non-gratuitous benefit conferred on it by Plaintiffs and the Economic Injury Class is unjust and inequitable, Defendant must pay restitution to Plaintiffs and the Class Members for its unjust enrichment, as ordered by the Court.

## NINTH CLAIM FOR RELIEF
### VIOLATION OF CALIFORNIA BUSINESS & PROFESSIONS CODE §§ 17200 *ET SEQ.* – UNLAWFUL CONDUCT PRONG OF CALIFORNIA'S UCL

216.    Plaintiff Murphy realleges and incorporates by reference the allegations elsewhere in the Complaint as if set forth fully herein.

217.    Plaintiff Murphy brings this claim on behalf of herself and the California Subclass.

218.    Defendant's acts, omissions, misrepresentations, and practices constitute "unlawful" business acts and practices under the California Business & Professions Code section 17200 ("UCL").

219.    Defendant's acts, omissions, misrepresentations and practices are "unlawful" because they violate the California False Advertising Law ("FAL"), the Magnuson-Moss Warranty Act ("MMWA") and the California Consumer Legal Remedies Act ("CLRA").

220.    Defendant's representations and omissions that the Products are non-toxic and safe are false, deceptive, and likely to deceive the public.

221.    Defendant's representations and omissions concerning the ingredients in the Products are false, deceptive, and likely to deceive the public.

222.    Defendant's deceptive advertising caused Plaintiff Murphy and members of the California Subclass to suffer injury in fact and to lose money or property, as it denied them the benefit of the bargain when they decided to make their purchases over other products that are less expensive and without the harmful and dangerous effects of the Products.

**TENTH CLAIM FOR RELIEF**
**VIOLATION OF CALIFORNIA BUSINESS & PROFESSIONS CODE §§ 17200**
***ET SEQ.* – UNFAIR AND FRAUDULENT PRONGS OF CALIFORNIA'S UCL**

223.    Plaintiff Murphy realleges and incorporates by reference the allegations elsewhere in the Complaint as if set forth fully herein.

224.    Plaintiff Murphy brings this claim on behalf of herself and the California Subclass.

225.    California Business & Professions Code section 17200 prohibits any unfair or fraudulent business act or practice.

226.    The false and misleading marketing, advertising, and labeling of the Products, as alleged herein, constitute unfair business acts and practices because such conduct is immoral, unscrupulous, and offends public policy.

227.    The acts, omissions, misrepresentations, practices, and non-disclosures constitute "fraudulent" business acts and practices, because Defendant's conduct is false and misleading to Plaintiff Murphy and California Subclass Members.

228.    Further, the gravity of Defendant's conduct outweighs any conceivable benefit of such conduct.

229.    Defendant's advertising, communications, packaging, and marketing of the Products deceived California Subclass Members about their contents and safety.

230.    Defendant knew that the claims and statements in the advertising, marketing, and labeling were likely to deceive consumers.

231.    Plaintiff Murphy seeks an order for the disgorgement and restitution of all monies from the sale of the Products that were unjustly acquired through acts of unlawful, unfair and/or fraudulent competition.

## ELEVENTH CLAIM FOR RELIEF
## VIOLATION OF CALIFORNIA BUSINESS & PROFESSIONS CODE §§ 17500 *ET SEQ.* – FALSE AND MISLEADING ADVERTISING

232.    Plaintiff Murphy realleges and incorporates by reference the allegations elsewhere in the Complaint as if set forth fully herein.

233.    Plaintiff Murphy brings this claim on behalf of herself and the California Subclass.

234.    California False Advertising Law (Cal. Business & Professions Code sections 17500 and 17508) prohibits "mak[ing] any false or misleading advertising claim."

235.    Defendant, in its advertising, marketing, and labeling of the Products, made false and misleading advertising claims that deceived consumers as to their safety.

236.    In reliance on these false and misleading advertising claims, Plaintiff Murphy and members of the California Subclass purchased and used the Products without the knowledge they

contained toxins that caused, or greatly increased the risk of, serious injury or death, to users of the Products.

237.    Defendant knew or should have known that its labeling, advertising, and marketing was likely to deceive consumers.

238.    As a result, Plaintiff Murphy and the Class are entitled to restitution and an order for the disgorgement of the funds by which Defendant was unjustly enriched.

## JURY DEMAND

239.    Plaintiffs demand a trial by jury on all issues.

**WHEREFORE**, Plaintiffs, on behalf of themselves and the proposed Classes, pray for judgment as follows:

(a)    Declaring this action to be a proper class action and certifying Plaintiffs as the representatives of the Classes under Rule 23 of the Federal Rules of Civil Procedure;

(b)    An Order requiring Defendant to establish a medical monitoring protocol for Plaintiffs and the Classes to monitor individuals' health and diagnose at an early stage any ailments associated with exposure to *Pseudomonas*, *Klebsiella*, *and/or Burkholderia cepacia*;

(c)    Awarding restitution and disgorgement, and actual, statutory and compensatory damages;

(d)    Awarding Plaintiffs and Class Members their costs and expenses incurred in this action, including reasonable allowance of fees for Plaintiffs' attorneys, experts, and reimbursement of Plaintiffs' expenses; and

(e)    Granting such other and further relief as the Court may deem just and proper.

Dated: May 1, 2023

**SQUITIERI & FEARON, LLP**

By: */s/ Stephen J. Fearon, Jr.*
Stephen J. Fearon, Jr.
Paul V. Sweeny
305 Broadway, 7th Floor

New York, New York 10007
Telephone: (212) 421-6492
Facsimile: (212) 421-6553
Email: stephen@sfclasslaw.com
Email: paul@sfclasslaw.com

**SHENAQ PC**
Amir Shenaq, Esq.*
3500 Lenox Road, Ste. 1500
Atlanta, GA 30326
Tel: (888) 909-9993
amir@shenaqpc.com

**THE KEETON FIRM LLC**
Steffan T. Keeton, Esq.*
100 S Commons Ste 102
Pittsburgh PA 15212
Tel: (888) 412-5291
stkeeton@keetonfirm.com

**GOOD GUSTAFSON AUMAIS LLP**
Christopher T. Aumais*
2330 Westwood Blvd., No. 103
Los Angeles, CA 90064
Tel: (310) 274-4663
cta@ggallp.com

*Pro hac vice forthcoming*

**ATTORNEYS FOR PLAINTIFFS
AND THE PROPOSED CLASSES**